In re EL PASO REFINERY, L.P., a Delaware Limited Partnership, Debtor.

No. 94–30051–LMC.

United States Bankruptcy Court, W.D. Texas, El Paso Division.

Dec. 4, 2000.

Margaret A. Christian, Kemp Smith, Duncan & Hammond, El Paso, TX, for Trustee.

H. Christopher Mott, Krafsur, Gordon, Mott, Davis & Woody, P.C., El Paso, TX, John P. Melko, Verner, Liipert, Bernhard, McPherson & Hand, Chtd., Houston, TX, for Trustee.

Andrew B. Krafsur, Trustee.

Deborah D. Williamson, Fee Examiner, Nancy Ratchford, Asst. U.S. Trustee, San Antonio, TX.

## MEMORANDUM DECISION REGARDING SECTION 330(A)(1) FEE APPLICATIONS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the Application for Compensation Increase by Special Counsel for Trustee, Krafsur, Gordon, Mott, Davis & Woody, P.C., the Application for Fee Enhancement by General Counsel for Trustee, Verner Liipfert, Bernhard, McPherson and Hand, Chartered, and the Application for Fee Adjustment by Special Counsel for Trustee, Kemp Smith, P.C.

### I. Background

This case marks the final chapter in the long-running El Paso Refinery, L.P. bankruptcy case. On October 23, 1992, El Paso Refinery, L.P. (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On November 2, 1993 the Court converted the bankruptcy case to a Chapter 7 and Andrew Krafsur was appointed as the interim trustee. After the conversion and divisional venue transfer of the case to the El Paso Division (and after a contested trustee election) this court appointed Krafsur as the permanent trustee to serve as the official representative of the Debtor's bankruptcy estate. In addition, three law firms were retained as counsel to the trustee in various matters.

The case has proceeded for a number of years in chapter 7, with all counsel operating at reduced rates—rates negotiated by the Chapter 7 Trustee that took into account the financial *extremis* in which the estate found itself upon conversion. While the case has been pending for quite a long time, it has not languished. Indeed, what appeared to be an administratively insolvent estate is now prepared to make distributions of post-petition interest to unsecured creditors.[1] The three firms in question now seek essentially two forms of relief—an adjustment of the hourly rates to be allowed to them to conform to the "lodestar" rate to which they believe themselves entitled, and a further upward adjustment of that rate (sometimes called a "fee enhancement") to reflect what they describe as the extraordinary and unexpected results achieved in this case.

A description of how these law firms were hired and what services they performed for the trustee throughout the case is essential to an understanding of this matter.

### A. KRAFSUR, GORDON, MOTT, DAVIS & WOODY, P.C., SPECIAL COUNSEL FOR TRUSTEE

In early 1994, with approval of the court, the firm of Krafsur, Gordon, & Mott (now Krafsur, Gordon, Mott, Davis & Woody, P.C.) was retained as special counsel for the trustee in this Chapter 7 case. Retention of KGM as special counsel was motivated by this court's ruling that the scope of services that could be performed by the

---

1. "Administrative insolvency" means that an estate lacks sufficient resources even to pay for the costs of handling the estate, such as trustee's commissions, sales commissions, storage costs, attorneys' fees, and the like. The significance of post-petition interest being paid to unsecured creditors is that distribu-tions in chapter 7 cases follow a system of absolute priority, in which classes of claims must be paid in full before subordinate classes are paid. Post-petition interest to unsecured creditors is the second to last priority, immediately above distributions to equity interest holders. *See* 11 U.S.C. § 726(a)(5).

El Paso-based firm, Kemp Smith, for the Trustee would have to be substantially restricted, given Kemp Smith's prior representation of Debtor in the Chapter 11 case. In addition, the trustee's general counsel, Verner, Liipfert, Bernhard, McPhearson and Hand, Chartered had at least potential conflicts of interest with respect to specific matters relating to the administration of the estate. Further, the Trustee needed to retain an El Paso-based firm to represent the estate, given the El Paso location of Debtor's business, records, and the bankruptcy case itself. By the same token, the Trustee was reluctant to retain his own firm as general counsel, given the size of the case and its high visibility, as well as the need for the kinds of resources that a larger firm such as Verner Liipfert could bring to bear in what was anticipated to be a difficult, protracted and complicated bankruptcy case.[2]

Due to the administrative insolvency of the estate at the time of the chapter 7 conversion, the Trustee insisted that KGM, as special counsel, render services for the estate at reduced hourly rates. Most of the legal services rendered by KGM were performed by Mr. H. Christopher Mott, a principal of KGM. Mr. Mott has been charging the estate at the reduced hourly rate of $165 per hour since 1994. Patrick R. Gordon, also a principal of KGM, has rendered legal services to the estate at a reduced hourly rate of $175 per hour. During the entire 6-year period that KGM has served as special counsel, there has been no increase in the hourly rate charged to the estate.

KGM has previously filed a total of eight interim fee applications with the court, covering services from January 1994 through August 1999. These fee applications sought interim compensation utilizing the reduced hourly rates of Mr. Mott, Mr. Gordon and other KGM professionals. Each of the fee applications were approved by the independent Fee Examiner and by the court by order after notice and hearing. The services rendered by KGM were also in compliance with the fee budgets established by the court.

KGM's detailed invoices, submitted to the court and the Fee Examiner, show that, during the 6-year period from January 1994 through February 2000, the firm has been paid $958,315 to date (at the aforementioned reduced rates). Mr. Mott expended a total of approximately 4,706 hours in representing the estate, while Mr. Gordon spent a total of approximately 1,039 hours. KGM now seeks an adjustment of its hourly rate from the reduced rate to what it maintains is the proper lodestar rate. Alternatively, if the court should settle on a lodestar rate lower than that sought by KGM, the firm asks for an upward adjustment (or fee enhancement) of the lodestar to reflect its contribution to the "rare and exceptional" result achieved in this case.

In its briefs and at the September 21, 2000 hearing, KGM highlighted four primary areas of service it provided to the Trustee and the estate. First, KGM provided legal representation for the estate with respect to numerous matters relating to TM & S Oil Company ("TM & S"), a wholly owned subsidiary of the estate. KGM rendered services relating to the sale of TM & S and numerous settlements and transactions involving TM & S, the estate, and the estate's creditors. Specifically, at the September 21 hearing, KGM pointed out that, when it was hired, Diamond Shamrock had an offer on the table to purchase TM & S for $6 million. Through extensive negotiations, KGM assisted the trustee in increasing the sale price for TM & S to $16.5 million. Diamond Shamrock was willing to pay a premium for TM & S, but only if it could obtain a court order authorizing the sale free and clear all liens. *See* 11 U.S.C. § 363(f). The difficulty was that the sale was structured as an asset sale, and TM & S (a subsidiary) was not itself in bankrupt-

---

**2.** One lawyer in this case, at an earlier proceeding, aptly described this case as a chapter 7 proceeding in name only. In many ways, he commented, this case operated more like a chapter 11 case.

cy. KGM forged an agreement with creditors to avoid reaching a serious jurisdictional impasse. KGM also headed off Bank Brussels Lambert ("BBL")'s motion to lift stay on Debtor's stock (a move which, if successful, would have destroyed the estate's ability to consummate the very profitable sale to Diamond Shamrock). KGM's successful defense of this motion forced BBL to return to the negotiating table. A deal was ultimately cut with BBL, by which BBL agreed to a payout of $3.4 million for their collateral interest in the TM & S stock.

Second, KGM represented the estate in a variety of environmental matters, including defending the estate from environmental claims and litigation with Refinery Holding Company LP ("RHC"),[3] Texaco Refining and Marketing Inc. and related entities ("TRMI"), and Chevron USA, Inc. ("Chevron"). If any of these environmental claims had been successful, any payout to unsecured creditors would have been eliminated either because, as prepetition claims they would have diluted any recovery for unsecured creditors or, as postpetition administrative claims, they would have eliminated any payout. Texaco sought $21 million in indemnity claims against the estate. KGM represented the Trustee in contesting this claim and obtained a favorable ruling after lengthy litigation. Subsequently, KGM negotiated a settlement that limited the estate's exposure to $1.5 million and allowed for a distribution to unsecured creditors.[4] Chevron filed a $100 million toxic tort claim against the estate for which it sought an administrative priority. Both were settled. The SPC judgment ($10 million preference) was given in part to Chevron, to settle the environmental claims. Chevron's claim grew out of a lawsuit (the MTBE litigation) brought by private litigants, naming Chevron and others, and alleging contamination of the water supply near the refinery. KGM channeled Chevron's claims to the expected recovery from the estate's preference judgment against Scurlock Permian Corporation, then on appeal, insulating the estate's core assets from the MTBE litigation. That settlement alone, occurring late in the administration of the case, allowed the trustee to pay allowed unsecured claims 100 cents on the dollar. Shortly after the settlement was struck, the Fifth Circuit reversed the SPC preference litigation. Absent the settlement, the estate would have lost millions of dollars.[5]

Third, KGM represented the estate with respect to federal tax matters, federal excise tax litigation with the Internal Revenue Service ("IRS"), and the resolution of other state and local tax claims. At the time KGM was hired, the estate had an excise tax liability in the amount of $14.5 million. A comprehensive settlement was achieved, with the IRS releasing all liens and excise tax claims in exchange for a payment of just $1 million.[6] Federal income tax matters were also handled in the form of planning and compliance. In addition, Mr. Gordon handled the first ever master limited partnership chapter 7. The Chapter 11 filing of Debtor's general part-

---

**3.** RHC was a holding company created by the Term Lenders to receive and hold the refinery upon the foreclosure sale that took place in the first year of the case. The Term Lenders obtained relief from stay to proceed to foreclosure only after entering into extensive agreement with the Examiner, the unsecured creditors' committee, and others. The agreement, denominated "the Term Sheet" throughout this bankruptcy case, has been a frequent subject of litigation, and has shaped the ultimate outcome of these proceedings.

**4.** The $1.5 million number was "secured" by a reserve which, by later agreement, was increased to $2 million.

**5.** At hearing, KGM pointed out that the SPC litigation had itself been settled with an "up side/down side" agreement, a portion of which subordinated any resulting SPC claim to the claims of unsecured creditors. KGM does not take credit for that particular settlement, however.

**6.** Additional sums were paid to the IRS out of the proceeds of the TM & S sale.

ner (El Paso Refining, Inc.) also triggered potentially adverse tax consequences, so Mr. Gordon did a "rollup" to protect the estate. In order to minimize tax exposure, Mr. Gordon also handled the sale of the Jobe Ranch. Other recoveries triggered income or discharge of indebtedness, raising timing and matching problems. A $1.1 million administrative claim was filed, triggering an audit. The State of Texas also filed a $9.7 million claim. Gordon helped settled this matter for $2.0 million cash plus a smaller secured and unsecured claim. The State of Arizona settled its $2.5 million tax claim against the Debtor for $1.1 million without litigation. In sum, the estate successfully satisfied tax claims totaling $29 million for $6 million.

Fourth, KGM served a local counsel role in administrative matters and El Paso-based litigation, represented the estate in the sale of various estate assets, and in certain claims and preference litigation in which the Trustee's general counsel had a potential conflict.

In summary, KGM handled six adversary proceedings, three appeals, and twenty contested matters. Most of the litigation costs were covered by the parties opposing KGM. KGM charged the estate $170,000 for its work in reducing the IRS's claims by $23 million.

KGM believes that an award by the court at an hourly rate of $250 for services rendered by Mr. Mott and Mr. Gordon is justified. If Mr. Mott's rate were adjusted to reflect a lodestar rate of $250 per hour (up from the reduced hourly rate of $165 per hour he has been billing) for services rendered through February 2000, the resulting fee increase would be $400,052. A similar adjustment for Mr. Gordon (up from his present reduced hourly rate of $175 per hour) for services rendered through February 2000, the amount of the fee increase would be $77,925. KGM believes that this rate increase can be justified solely as a lodestar award. In the alternative, if this court awards KGM a lower lodestar award, KGM argues that this court should then enhance that lodestar award to the requested $250 per hour rate increase.

## B. VERNER, LIIPFERT, BERNHARD, MCPHERSON AND HAND, CHARTERED, GENERAL COUNSEL FOR TRUSTEE

By Order entered March 7, 1994, this court approved the retention of Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, ("VL") as general counsel to the Trustee. The Retention Order provided that VL would render professional services at a discounted rate and that VL would be allowed to seek an enhancement of its rates, to a level equal to or exceeding its normal hourly rates, at the conclusion of the bankruptcy case.

The Trustee believed that substantial value could be recovered for the benefit of unsecured creditors if claims against the secured creditors were investigated and if warranted, pursued. VL agreed to undertake this investigation. However, both the Trustee and VL faced a seemingly insurmountable barrier: there was little, if any, unencumbered money with which to do much of anything in the case, let alone pursue expensive litigation against well-funded opponents.

The working capital lenders, Bank Brussels Lambert (BBL) and Scurlock Permian Corporation (SPC), refused to consent to the use of their cash collateral for any purpose at all (let alone the funding of litigation against either or both of them).[7] Outside of their cash collateral, there were no other available sources of cash in the estate. VL's first task was thus to litigate

---

7. Section 363(c) states that a trustee may not use collateral that is essentially cash (receipts from receivables is an example) without either the consent of the creditor or the approval of the court. The latter course requires litigation over questions of adequate protection. The lenders' refusal to consent was perfectly understandable, entirely justified, and—especially because this was a chapter 7 proceeding—fully anticipated.

the use of cash collateral, which it did successfully.[8] Subsequently, VL led negotiations on behalf of the trustee leading to a settlement which resulted in, among other things, SPC's payment of $6 million to the estate.[9] Additionally, SPC later paid another $2 million in settlement of a preference action prosecuted by other counsel. VL also assisted the Trustee in the successful negotiation of a settlement with BBL which greatly benefitted the estate by resolving litigation and preserving assets available .for distribution to other creditors.

In total, VL assisted the Trustee in forty-one separate projects at a blended rate of $132 an hour. One of the more complicated matters involved litigation of the estate's interest in the Chapter 11 case filed by the Debtor's general partner, El Paso Refining, Inc. (the "General Partner"). The General Partner objected to the Trustee's proposed settlement with Santa Fe Pacific Pipeline.[10] Ultimately, the Trustee, through VL, established that any claim of General Partner was derivative of the debtor, and thus was property only of EPR's estate. Another matter involved resistance by the Term Lenders and Chevron, U.S.A. to the Trustee's effort to make an interim distribution to unsecured creditors in the last quarter of 1997. VL represented the Trustee in obtaining an agreement from these entities to permit the

distribution. The settlement with the Terms Lenders ultimately resulted in payment in full, and on an accelerated basis, of the entire $7 million due to the Trade Creditors under the Term Sheet.

VL was also successful in reducing the claim of an entity known as UOP[11] from $4,040,910.25 to $2,128,991.44. VL assisted the Trustee in negotiating an agreed judgment between the trustee, the Term Lenders and Glitsch Field Services (who were asserting mechanics' and materialmen's liens). VL also handled claims litigation, reducing the estate's exposure from $13.4 million to only $1.0 million in claims allowed against the estate. VL took the lead in identifying and challenging avoidable transfers not previously identified by the Examiner during the Debtor's previous Chapter 11 proceedings. These preference litigation efforts resulted in $1,614,903.57 of cash re-payments pursuant to agreed orders, $423,180.40 in total judgments and $353,105.99 in total reductions in pre-petition unsecured claims. VL prepared and obtained a dismissal of a $525,000.00 claim filed against the estate by Cimarron Gas Liquids. VL also helped in negotiating the ING Adversary Proceeding, which resulted in a $350,000 recovery for the estate. A similar result was obtained in the preference litigation with Exxon, in which the estate realized a bene-

---

**8.** Contested cash collateral matters are difficult both factually and legally. In a case such as this, the trustee's burden of proving adequate protection was especially daunting given that the refinery itself was no longer in the estate—the Term Lenders had taken possession prior to the conversion of the case. Given the difficulty of this particular piece of litigation, and the stakes that were involved, the result obtained was impressive. VL obtained a successful ruling at the trial court level, then successfully defended that ruling on appeal.

**9.** The estate had sued SPC in state court on a variety of theories that might generically be described as "lender liability" actions.

**10.** This litigation was pending in two forums—a state district court and an adminis-

trative proceeding in Washington, D.C. The latter proceeding was essentially settled for no gain or loss to the estate. The state court proceeding, however, was widely reputed to be worth a great deal of money. The GP insisted that the suit was worth in excess of $200 million, and was most unwilling to accede to the Trustee's proposed settlement for $16 million. The GP (and its principals) opposed the settlement because, for that entity, only a large recovery would yield a payout from EPR to the GP. Again, the opposition was certainly understandable. Given the stakes, however, it is easy to see why the settlement was so hotly contested and hence difficult to achieve.

**11.** UOP supplied certain chemicals and processes to the estate under a licensing agreement.

fit of $600,000.00. Finally, VL assisted the Trustee in reviewing unsecured creditors' claims and challenging questionable claims. Claims were reduced from over $100 million to approximately $20 million.

Billing at reduced rates, VL has billed the estate $2,049,907.50 through May 2000, for 15,228.50 hours. With minor exceptions which VL has voluntarily reduced, and subject to holdback for interim billing, virtually the entire amount has been paid. Had VL billed at its normal hourly billing rates for its professionals, an additional $278,463.50 would have been requested. By this application, VL seeks restoration to its normal hourly billing (from 1994 to May 2000). VL separately seeks an enhancement of $200,000.

## C. KEMP SMITH, P.C., SPECIAL COUNSEL FOR TRUSTEE

Kemp Smith, P.C. ("Kemp Smith") served as general bankruptcy counsel for the Debtor in its chapter 11 case and also as counsel to the Debtor on a contingency fee basis in a pending state court case (the "State Court Litigation"). Upon conversion of the bankruptcy case from a chapter 11 case to a chapter 7 case and the appointment of the Trustee, this Court authorized the employment of Kemp Smith as special counsel for the Trustee under 11 U.S.C. § 327(e) to continue representation of the Trustee in the State Court Litigation on a contingency fee basis and to pursue a preference action against Scurlock Permian Corporation (the "Scurlock Preference Action"). The court also permitted Kemp Smith to be paid for limited assistance in the transition of the case from the Debtor in Possession to the trustee.

Through the course of Kemp Smith's six-year representation of the Trustee in this case, Kemp Smith provided services regarding a variety of matters. Among other things, Kemp Smith assisted with some tax matters and with the TM & S sale. More significantly, however, Kemp Smith was heavily involved in the Scurlock Preference Action, trying the case at the trial level and representing the Trustee on appeal to the Fifth Circuit.[12] At the end of the day, Scurlock paid Chevron and the estate $2,000,000, from which the estate retained approximately $650,000. As part of the settlement, Chevron waived its own $10,000,000 claim against the estate arising out of the MTBE litigation. Total approved fees for all timekeepers' work on the Scurlock matter during chapter 7 were approximately $390,000. Finally, the results of the State Court Litigation provided $32,000,000 of secured debt waiver, $6,000,000 in cash, and subordination of a $2,000,000 claim. Although Kemp Smith was entitled to 33⅓% of the State Court Litigation recovery, Kemp Smith only received 8%.

All matters handled by Kemp Smith as Special Counsel to the trustee have been concluded. As of October 1999, this Court has awarded Kemp Smith $624,336,08 in payment for services rendered to the trustee, including expenses, for the period of November 1993 through July 1999. Kemp Smith has also been awarded a contingent fee by this Court for services rendered in the State Court Litigation. Kemp Smith has received all of the amounts awarded to it. The Order Granting Seventh and Final Application for Compensation and Reimbursement of Fees and Expenses by Kemp, Smith, Duncan & Hammond, P.C., Special Counsel for Trustee, for Period of August 1, 1998 through October 31, 1999, was entered on November 22, 1999, and provided that it was "a final order except to the extent to which this Court would award any fee enhancement to professionals at the con-

---

**12.** At issue were $82,000,000 in daily wire transfers to and crude deliveries from Scurlock Permian Corporation, an under secured creditor, to the refinery in the 90 day window preceding the bankruptcy. The preference action raised extremely complex issues of law regarding lien sharing, assignments, subordination, ordinary course defense, and subsequent new value defense.

clusion of the case." By filing this Application for Fee Adjustment, Kemp Smith now seeks an additional fee award of $99,947.50.

## II. Issues Presented

The resolution of this case primarily turns on the complex and intensely conflicting legal standards governing lodestar awards and the upward adjustments of such awards in the context of bankruptcy. The precise questions in this case are (1) to what lodestar award are the applicants entitled under 11 U.S.C. § 330(a)(1), and (2) do the services rendered justify an upward adjustment of that lodestar award.[13]

## III. Analysis

This analysis is divided into three categories. The first section looks at pre–1994 jurisprudence relating to lodestar awards and upward adjustments of lodestar awards. The second section discusses developments that have taken place in the law since the 1994 amendments of section 330(a). The third section applies the law to the facts as to each applicant in this case, both with respect to setting a lodestar and determining whether enhancement is appropriate.

## A. Pre–1994 Lodestar and Adjustment Standards

Prior to the Bankruptcy Act of 1978, a bankruptcy court could compensate the provider of legal services to the bankrupt estate if the amount of the award was "reasonable." *See* Section 64(a)(1) of the Bankruptcy Act, 11 U.S.C.A. § 104 (Supp.

1976) and Rule 219(c)(1) of the Rules of Bankruptcy Procedure. In an effort to "establish an objective basis for determining the amount of compensation that is reasonable for an attorney's services," the Fifth Circuit, in *Matter of First Colonial Corp. of America,* 544 F.2d 1291 (5th Cir. 1977), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977), required bankruptcy courts to consider the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). These twelve factors are as follows: 1) time and labor required; 2) novelty and difficulty of the issues; 3) skill required to perform the legal services properly; 4) preclusion of other employment; 5) customary fees; 6) whether the fee is fixed or contingent; 7) time limitations imposed by clients or circumstances; 8) amount involved in results obtained; 9) experience, reputation and ability of the attorneys; 10) undesirability of the case; 11) nature and length of the professional relationship with the client; and 12) award in similar cases. *See Johnson,* 488 F.2d at 717–18 (*"Johnson* factors"). The *First Colonial* court admitted that *Johnson* was a civil rights case and had no relation to bankruptcy, but, the court reasoned, the guidelines were appropriate in any case where attorneys' fees were authorized by statute. *See First Colonial,* 544 F.2d at 1299.[14]

*First Colonial* also stated that bankruptcy courts should keep in mind two additional considerations in applying the *Johnson* factors: first, economy is the most important principle in awarding fees to the trustee's attorneys;[15] and, second, the

---

**13.** The parties' briefs primarily focus on Section 330(a)(3). As noted below, however, Section 330(a)(3) was not added to the Bankruptcy Code until October 1994. Because this case was commenced prior to October 1994, Section 330(a)(3) is inapplicable. Thus, this Court must apply the old Section 330(a)(1) lodestar standards.

**14.** The court drew no distinction between the dynamics that might justify the shifting of fees from loser to winner, as was the situation in

*Johnson,* and the dynamics that might justify the sharing of fees among beneficiaries of a common fund, as is the situation in bankruptcy (as well as probate and class actions).

**15.** The Bankruptcy Act of 1978 legislatively overruled any "notions of economy of the estate in fixing fees." H.R.Rep. No. 95–595, 95th Cong., 1st Sess., 330 (1977), U.S.Code Cong. & Admin.News pp. 5963, 6286. Such notions were considered to be "outdated" and had "no place in a bankruptcy code." *Id.*

court should be wary of any duplicative fees or non-legal services. *See id.* Finally, *First Colonial* set forth a three-step process that bankruptcy courts were to follow in determining reasonable attorneys' fees: 1) the nature and extent of the services supplied by the attorney must be ascertained; 2) the value of those services must be assessed; and 3) the court must give a brief explanation of the findings and reasons why the award was granted, including a description of how all of the twelve *Johnson* factors affected the court's decision. *See id.* at 1299–1300.

After the *First Colonial* decision, Congress enacted the Bankruptcy Act of 1978. This Act provided bankruptcy courts with some guidelines as to how "reasonable compensation" should be determined. *See* 11 U.S.C. § 330(a)(1). Bankruptcy courts were instructed to base reasonable compensation on "the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title." *Id.* The question posed for bankruptcy professionals by the codification of a standard for compensation was how (and whether) *First Colonial,* and the *Johnson* factors, applied in bankruptcy cases filed under the new Code.

But the *Johnson* factors were themselves undergoing subtle change in non-bankruptcy decisions handed down by the circuit. In 1982, the Fifth Circuit refined the *Johnson* analysis, effectively melding into the "lodestar" methodology in use in other circuits for setting fees in federal

non-bankruptcy cases. *See Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1092–93 (5th Cir.1982) (*Copper Liquor III*) (addressing fees in an anti-trust case). In *Copper Liquor III,* the Fifth Circuit affirmed the *First Colonial* test and procedure, but added that four of the twelve *Johnson* factors deserved "special heed": 1) time and labor involved; 5) customary fee; 8) amount involved and the results obtained; and 9) experience, reputation, and ability of counsel. *See id.* at 1092. The *Copper Liquor III* court further reasoned that these four "special" factors could be considered in a three-tiered framework similar to but not quite the same as that described in *First Colonial.* According to *Copper Liquor III,* lower courts setting fees were to follow the following three step process:

(1) Ascertain the nature and extent of the services supplied by the attorney;

(2) Value the services according to the customary fee and quality of the legal work;

(3) Adjust the compensation on the basis of other Johnson factors that may be of significance in the particular case.

*Id.* (citing *Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575 (5th Cir.1980) (*Copper Liquor II*) (relying on *First Colonial,* 544 F.2d at 1299–1300)).[16] Interpreted in this fashion, the *Copper Liquor III* court noted, the *Johnson* test was very similar to the lodestar method being used by the Second,[17] Third[18] and District of

---

The 1978 version of section 330(a) provided that "the cost of comparable services other than in a case under this title" forms the basis of attorney compensation. 11 U.S.C. § 330(a)(1).

**16.** It is important to note that the first two parts of this framework parallel almost exactly Section 330(a)(1)'s definition of "reasonableness." The first step in the *Copper Liquor* test parallels that portion of the statute directing the court to determine "the nature, the extent, and the value of such services, the time spent on such services," while the second step parallels the directive to compare

fees sought to "the cost of comparable services other than in a case under this title." *Id.; see* 11 U.S.C. § 330(a)(1) (pre–1994 version). The third part, the adjustment, has no counterpart in Section 330(a) and is purely a creature of case law.

**17.** *See e.g., City of Detroit v. Grinnell Corp.,* 560 F.2d 1093 (2d Cir.1977).

**18.** *See e.g., Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir.1976) (en banc).

Columbia Circuits.[19] *See id.* at 1092–93. "The 'lodestar' is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. The lodestar is then adjusted to reflect other factors such as the contingent nature of the suit and the quality of the representation." *Id.* at 1093 (citing *Copeland v. Marshall*, 641 F.2d 880, 891–94 (D.C.Cir.1980) (en banc)). This new method was ratified in another fee-shifting case, *Graves v. Barnes*, 700 F.2d 220, 222 (5th Cir.1983) (addressing voting rights).[20] The *Johnson* factors thus became subsumed in the *Copper Liquor III* "refined test."

The refined test was first applied in a bankruptcy context in *In re Lawler*, 807 F.2d 1207 (5th Cir.1987), albeit a case decided under the Bankruptcy Act.[21] *Lawler* summarized the new, "refined" standard as requiring lower courts to apply "the *Johnson* and *First Colonial* factors in the lodestar context mandated by *Copper Liquor*." *Lawler*, 807 F.2d at 1211. Unfortunately, because the case did not arise under the Bankruptcy Code, the court did not address what, if any impact, the Code might have had on its application of the

*Copper Liquor* "refined test" to fees in bankruptcy cases.[22]

One can see that step three of the *Copper Liquor* test called for the application of the *Johnson* factors to make any appropriate adjustment to the "lodestar." What was still uncertain was the extent to which (if at all) courts were *also* to consult the *Johnson* factors in setting the lodestar in step two of the test, where lower courts were directed to "[v]alue the services according to the customary fee and quality of the legal work was to be applied." *See Copper Liquor III*, 684 F.2d at 1093 (citing *Copeland v. Marshall*, 641 F.2d 880, 891–94 (D.C.Cir.1980)) (en banc) ("The lodestar is then adjusted to reflect other factors such as the contingent nature of the suit and the quality of the representation"). Were the *Johnson* factors to be consulted only *after* the lodestar was determined, or were at least some of those factors subsumed *within* the lodestar itself? And if the latter, were not some of the *Johnson* factors in danger of being double counted?

The Fifth Circuit issued a decision not long after its ruling in *Copper Liquor*,

19. *See e.g., Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) (en banc).

20. "The Fifth Circuit recently adopted the 'lodestar' method of calculating attorney's fees ..." *Id.* at 222 (citing *Copper Liquor III*, 684 F.2d at 1092–93 & n. 11) (other citations omitted). The *Graves* court reiterated that lower courts are still required to show how the twelve *Johnson* factors affect the decision in arriving at "reasonable compensation." *See id.* at 221.

21. *Lawler* was decided under the Bankruptcy Act of 1898 (held to be controlling in that case). As such, the court found, the issue of "economy," as described in the *First Colonial* case, was still a major factor influencing the court's decision. *See id.* The court was not called upon either to apply section 330(a)(1) of the Bankruptcy Code, or to consider whether the statute might alter the application of the *Copper Liquors* refined test. The court *had* decided a bankruptcy fee case *before*, but made no use of *Copper Liquor* and its refined lodestar test. In *Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249 (5th Cir. 1986), the Fifth Circuit only held that the high

level of expertise displayed in a complicated bankruptcy reorganization did not automatically warrant an upward adjustment. The court never discussed *Copper Liquor*, noting only that it found "no error" in the bankruptcy court's application of the *Johnson* factors to arrive at an appropriate hourly rate. The word "lodestar" does not appear in the court's analysis.

22. Recall that bankruptcy fees are in essence "common fund," as opposed to "fee shifting" cases. Thus, it was not yet clear what, if any, impact that distinction might have on the application of the refined test developed in *Copper Liquor* to bankruptcy matters. *Cf. International Woodworkers of America, AFL–CIO v. Champion International Corp.*, 790 F.2d 1174, 1177 (5th Cir.1986) (describing three exceptions to American Rule generally recognized in equity: cases involving preservation of a common fun, cases involving vexatious or oppressive prosecution or maintenance of a defense, and cases involving wilful disobedience of a court order).

suggesting that "our circuit's method ... is generally to apply the Johnson factors *after* the lodestar has been calculated." *Riddell v. National Democratic Party*, 712 F.2d 165, 170 (5th Cir.1983)(emphasis added). *Riddell* was decided immediately following the Supreme Court's ruling in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Supreme Court had there explained that "[t]he product of the reasonable hours times a reasonable rate does not end the inquiry. There remain *other considerations* that may lead the district court to adjust the fee upward or downward, including the important factor of 'results obtained.'" *Id.* at 434, 103 S.Ct. 1933 (emphasis added). The Supreme Court also noted that many of the *Johnson* factors are already subsumed within the initial calculation of the "lodestar." *See id.* at 434 n. 9, 103 S.Ct. 1933.

The apparent inconsistency between the procedure described by the Supreme Court and the process employed in the Fifth Circuit (as described in *Riddell*) was at least elided in *Graves* (the voting rights case), in which the court held that "a court need not in determining the [adjustment] consider some factor already included in the calculation of the lodestar." *Graves*, 700 F.2d at 224. Yet, just two years later, the Fifth Circuit, after, acknowledging the conflicting standards, reiterated that "[t]he important point is that the district court 'explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors in Johnson affected his decision.'" *Sims v. Jefferson Downs Racing Assoc.*, 778 F.2d 1068, 1084 (5th Cir.1985) (citing *Copper Liquor II*, 624 F.2d at 581) (other citations omitted). Thus, the Fifth Circuit came full circle in just two years, first stating that some of the Johnson factors

were subsumed in the lodestar, then that none of the Johnson factors were to be applied unless the court wanted to adjust the lodestar, and, finally holding that "the award" (presumable the lodestar) was to be based upon all twelve Johnson factors.

Some of the confusion began to clear in *Von Clark v. Butler*, 916 F.2d 255 (5th Cir.1990) (a civil rights case). In *Butler*, the Fifth Circuit, citing *Sims*, cautioned that "[t]he district court must be careful not to 'double count' a Johnson factor already considered in calculating the lodestar when it determines the necessary adjustments under part three of the 'framework.'" *Id.*, at 258 (citing *Sims*, 778 F.2d at 1084). But the court also charted a way out of the potential conflict by intimating that all twelve of the factors might not need to be addressed when deriving the base "lodestar" rate calculation: "After calculating the lodestar amount, the district court must then apply *the remaining* Johnson factors to determine if the lodestar should be adjusted." *Id.* (citing *Nisby v. Commissioners Court of Jefferson County*, 798 F.2d 134, 137 (5th Cir.1986)).[23] *Butler* also hinted that the lodestar award is evidently yielded by completing the *first two* steps of the *Copper Liquor* refined test. The third step is evidently reserved for what other courts might call "fee enhancement." The circuit confirmed that was indeed its thinking process three years later in *Shipes v. Trinity Industries*, 987 F.2d 311 (5th Cir.1993). According to *Shipes*:

> As the first step in determining the amount of attorneys' fees to award, the district court must determine the compensable hours from the attorneys' time records, including only hours reasonably spent. As a second step, the district court must select an appropriate hourly

---

**23.** Recall that the third step in the revised test announced in *Copper Liquor* directs a court to "adjust the compensation on the basis of the other Johnson factors that may be of significance in the particular case." *Copper Liquor III*, 684 F.2d, at 1092. The second step (the

one that is supposed to yield the base compensation rate) has the court valuing the services "according to the customary fee and quality of the legal work," a process which presumably entails an examination of at least some of the *Johnson* factors. *Id.*

rate based on prevailing community standards for attorneys of similar experience in similar cases. The number of compensable hours is then multiplied by the selected hourly rate to produce the "lodestar" award.

. . . .

After determining the lodestar amount, the district court may adjust the lodestar up or down in accordance for relevant Johnson factors not already included in the lodestar. After calculating the lodestar amount, the district court must then apply the remaining Johnson factors to determine if the lodestar should be adjusted; the district court must be careful, however, not to double count a Johnson factor already considered in calculating the lodestar when it determines the necessary adjustments. *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990). Furthermore, the district court must explain with a reasonable degree of specificity the findings and reasons upon which the award is based, including an indication of how each of the Johnson factors was applied. *Id.* Four of the Johnson factors—the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation—are presumably fully reflected in the lodestar amount. *Alberti v. Klevenhagen*, 896 F.2d 927, 930 (5th Cir.), *vacated in part*, 903 F.2d 352 (5th Cir.1990). Although upward adjustments of the lodestar figure based on these factors are still permissible, such modifications are proper only in certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts. *Id.*

*Id.* at 321 (certain citations omitted).

What we learn from *Shipes*, then, is that *four* of the twelve Johnson factors—novel-ty and complexity of the issues, special skill and experience of counsel, quality of representation, and results obtained from the litigation—are taken into account in the "lodestar" calculation and are presumably not to be "double-counted" in addressing the third step (at least not in the usual case). The lower courts are permitted, in step three of the *Copper Liquor* test, to further adjust the lodestar award up or down in accordance with the *remaining eight* Johnson factors not already considered in setting the lodestar. Further, however, the lower courts *can* double-count the four *Johnson* factors subsumed in the lodestar for purposes of adjusting the lodestar in step three, but only if the case is "rare and exceptional" and only if the adjustment is supported by both specific evidence on the record and detailed findings of fact. In *Shipes* itself, the court upheld the three step lodestar adjustment made by the lower court, even though that adjustment "double counted" some of the *Johnson* factors, because there were findings in the record as to the "rare and exceptional" nature of the case, specifically with regard to "results obtained." *See id.* at 321.

The Fifth Circuit found an opportunity to apply the *Shipes* interpretation of the *Copper Liquor* three-part test the following year—this time serendipitously in a bankruptcy case. *Transamerican Natural Gas Corp. v. Zapata Partnership, Ltd. (In re Fender)*, 12 F.3d 480 (5th Cir.1994). The lower court had made an upward adjustment of the lodestar award, presumably following the procedures laid out in *Copper Liquor*. The Fifth Circuit repeated what it had said in *Shipes*, namely, that the lodestar award could be adjusted upward in accordance with a *Johnson* factor only if that factor had not already been taken into account by the lodestar.[24] *See*

---

**24.** Curiously, *Fender* makes no mention of Section 330(a)(1) of the Bankruptcy Code. One reason for this may be that *Shipes*, the case upon which *Fender* most heavily relies, and the cases cited therein, was not a bank-ruptcy case. Another possible reason is that the "lodestar" method closely parallels Section 330(a)(1), as noted above, and so raised no inconsistency necessitating a closer statutory analysis.

*id.* at 487. Confusingly, however, the court also stated that a court awarding a lodestar must explain how *all twelve* of the *Johnson* factors affect its "award." *See id.* (citing *Longden v. Sunderman,* 979 F.2d 1095, 1100 (5th Cir.1992)).[25] Could all twelve factors be applied in step two, then consulted again in step three, without double counting? The illogic was cleared up later in the opinion as the court recounted, without criticism, the way the lower court had taken into account only *Johnson* factors 1, 2, 3, 8 and 9 in arriving at the step two lodestar. *See id.* at 488. The *Fender* court criticized the lower court for relying on four of these same five factors (factors 2, 3, 8 and 9) in its step three adjustment to the lodestar award, holding that *four* of the twelve *Johnson* factors are subsumed in the "lodestar" step. *See id.* (quoting *Shipes*). Thus, when *Fender* explained that a lower court must show how all twelve of the *Johnson* factors affected the "award," it must have been referring to the *overall* award, and not just to the lodestar award.

This reading of *Fender* is supported by *Fender's* reliance on *Longden. See id.* at 487; *see also Longden v. Sunderman,* 979 F.2d 1095 (5th Cir.1992). In *Longden* (a class action case in which the court applied the lodestar method to arrive at an appropriate fee), the court had set out the following directive for calculating lodestar awards:

> The "lodestar" is computed by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work [citing *Copper Liquor*]. The court then adjusts

the lodestar upward or downward depending on the respective weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). The district court must explain how each of the Johnson factors affects its award, regardless of their specific factual significance; and "while the subsidiary fact findings are reversible only if clearly erroneous . . . review of the total fee is [governed] by the precept that its amount lies in the trial judge's discretion, and is to be recalculated only if that discretion is abused." *Copper Liquor,* 684 F.2d at 1092, 1094 (emphasis added).

*Id.* at 1099–1100. In this context, it is clear that *Longden* intended lower courts to show how the twelve *Johnson* factors affect the final, "total fee" award, and not just the "lodestar" determination. Thus, it seems fair to infer that *Fender* had the same meaning in mind.[26]

That the *Johnson* factors no longer played quite so large a role in a bankruptcy court's determination of "reasonable compensation" (i.e., the base "lodestar"), except inasmuch as four of the factors are still subsumed in the lodestar calculation, seems to find support in two recent Fifth Circuit cases. The first case, *Matter of National Gypsum Co.,* 123 F.3d 861 (5th Cir.1997), addressed the interplay of Sections 328 and 330 of the Bankruptcy Code. Notably, the court applied the 1978 version of the Bankruptcy Code, as the case had been commenced prior to the 1994 amendments to Section 330. *See id.* at 862. *National Gypsum* focused on whether a

---

**25.** The court did not explain whether the "award" to which it was referring was the mere "lodestar" (the one yielded by steps one and two of the *Copper Liquor III* refined test) or the final computation of the attorneys' fees, including any adjustment of the "lodestar" (*i.e.,* the one yielded after the completion of all three steps of the *Copper Liquor III* refined test). If the term "award" was used only in reference to the lodestar, then *Fender* is a difficult case to understand. After all, how is a court ever to grant an adjustment of a

lodestar if all twelve *Johnson* factors must be considered in granting the lodestar, and the *Johnson* factors may never be double-counted in determining any adjustment?

**26.** In truth, it might be inferred from *Longden* that the *Johnson* factors do not even come into play until the court has already arrived at a base compensation, derived from some other source (Nonbankruptcy rates? Community rates?).

bankruptcy court, which had previously approved counsel's compensation under Section 328, could later modify that agreement under Section 330. *See id.*[27] For purposes of our case, *National Gypsum* is relevant to our case because of the following observation there made:

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of [the 1978 version of] the Bankruptcy Code, which provides that the court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc.

*Id.* at 862. Several important points emerge out of this simple statement. First, the Fifth Circuit admits that "uncertainty" prevails in Section 330 "reasonable compensation" cases. Second, Section 330 is said to govern a bankruptcy court's determination of "reasonable compensation." Finally, no mention is made of the "lodestar" method or the *Johnson* factors in determining "reasonable compensation." Thus, one might infer that the primary touchstone for evaluating fees in bankruptcy cases in this circuit is the statute itself, and that the *Copper Liquor III* "lodestar" method (and its attendant importation of the *Johnson* factors) is relevant only insofar as it can be said to fairly explicate how to arrive at the statute's directive to award "reasonable compensation" as that term is used by Congress in Section 330 of the Bankruptcy Code.

A recent decision by the Fifth Circuit seems to confirm the correctness of that inference. *Matter of Texas Securities,* 218 F.3d 443 (5th Cir.2000). Like *National Gypsum,* this case too focused on the interplay between Sections 328 and 330, in their pre–1994 incarnations. *See generally id. Texas Securities* repeatedly makes reference to the "reasonable compensation" calculation governed by what it calls "the lodestar formula of § 330(a)" or "the lodestar formula of § 330(a)(1)". *See id.* at 445, 446. Apparently, the Fifth Circuit now thinks that the lodestar formula set out in *Copper Liquors* is at least parallel to if not coterminous with the analysis imposed by Section 330(a)(1) of the Bankruptcy Code for setting the fees of professionals in bankruptcy cases. More importantly for our purposes, however, both *Texas Securities* and *National Gypsum* support the further conclusion that, to the extent that *Copper Liquor III* and Section 330(a)(1) are inconsistent, the latter will control. Put another way, the "lodestar" method announced in *Copper Liquor III* and the *Johnson* factors subsumed therein, as further refined by the court's later explications in *Shipes* and *Fender,* are applicable to our calculations, but only insofar as they are not inconsistent with the plain language of Section 330(a)(1).[28]

Two questions immediately emerge. Firstly, which of the *Johnson* factors are appropriate in calculating the Section 330(a)(1) lodestar award (keeping

---

**27.** The Fifth Circuit held that the bankruptcy court had to protect its original agreement unless unforeseen developments occur. *See id.* Because none had occurred in this case, the Fifth Circuit refused to permit the lower court to modify the agreement under Section 330. *See id.* at 863.

**28.** It needs to be recalled that the explication of the *Copper Liquor* refined test has taken place largely outside the bankruptcy arena. No circuit level bankruptcy decision has directly held that *Copper Liquor* is the proper method for arriving at the correct computation of "reasonable compensation" within the meaning of Section 330(a)(1) of the Bankruptcy Code. By the same token, the circuit has thus far not ruled that *Copper Liquor* does *not* apply in the bankruptcy context. We do have a small indication that, in the event of a direct conflict between the circuit's test and the language of the statute, the statute will control. *See Int'l Woodworkers of America v. Champion Int'l Corp.,* 790 F.2d 1174, 1178 (5th Cir. 1986).

in mind that *Shipes* suggests four of those factors [29] are relevant in arriving at the *Copper Liquor* counterpart to Section 330(a)(1), step two of that test). Secondly, is it inconsistent with Section 330(a)(1) to make any adjustment to the lodestar, *ala* step three of *Copper Liquor's* test, much less an adjustment that double counts a factor for the "rare and exceptional" case?

The answer to the second of these questions is not easy, especially given that this court has, on at least one occasion, granted a fee enhancement request. *See In re Farah*, 141 B.R. 920 (Bankr.W.D.Tex.1992) (following *Von Clark v. Butler, supra*). The first, however, may prove to be far less troublesome. The Fifth Circuit has itself said that four *Johnson* factors (the novelty and complexity of the issues, the skill and experience of counsel, the quality of services rendered, and the results obtained) bear on the court's determination of the lodestar, and 'that is conceptually consistent with the statute's own directives to base reasonable compensation on "the value of such services, the time spent on such services, and the cost of comparable services other than in a case under [ ] title [11]." 11 U.S.C. § 330(a)(1) (pre–1994 en-

actment); *see also Shipes v. Trinity Industries, supra*. Indeed, the statute requires the court to look at the time spent on services, and that is also what is required in both step one of *Copper Liquor* and factor one of the *Johnson* factors. One might also add in two additional *Johnson* factors, the customary fee and awards in similar cases, as they are similar to (though not precisely the same as) "the cost of comparable services other than" in a bankruptcy case.

The remaining five factors, as it turns out, seem to be of little use either in deriving the lodestar for purposes of Section 330(a)(1) or, for that matter, of adjusting the lodestar (should step three of the analysis be permissible). Those five—preclusion of employment, whether the fee is fixed or contingent, time limitations, undesirability of the case and the nature and length of the professional relationship with the client—are the sorts of questions one might ask in a typical fee-shifting kind of case (such as, for example, an action for a civil rights violation). They have little relevance in the context of a bankruptcy case.[30]

**29.** Those four factors, it bears repeating, are (1) novelty and complexity of the issues; (2) special skill and experience of counsel; (3) quality of the representation; and (4) results obtained. *Shipes*, 987 F.2d, at 320. The district court in the *Shipes* case had used the following factors in setting the lodestar: (1) time and labor required; (2) customary fee; (3) counsel's experience and ability; and (4) awards in similar cases. The district court then enhanced the fee, using the following factors: (1) novelty and difficulty of the case; (2) special skill required; (3) preclusion of other employment; (4) special time limits imposed by the case; and (5) results obtained. The court found that the "skill required" and "special time limits imposed" factors were already subsumed in the lodestar, though it is apparent that, in fact, "special time limits" was *not* one of the factors used by the district court in setting its lodestar, nor is it one of the factors the circuit says is *presumed* to be used in calculating a lodestar.

**30.** Preclusion of employment presumes that the lawyer does not normally take the sort of case for which fees are being requested.

Bankruptcy cases are routinely handled by specialists who (they hope) do little else than handle bankruptcy matters. Whether the fee is fixed or contingent again is not relevant to a Section 330(a)(1) analysis because, if the fee *is* contingent, then *National Gypsum* tells us that the relevant statute for its award is not Section 330(a)(1) but Section 328. *See National Gypsum, supra* at 863. Time limitations are part and parcel of all bankruptcy representation, so its consideration adds nothing to the analysis. Bankruptcy cases are not inherently "undesirable" in the way that handling a civil rights case might be thought to be. Finally, examining the length of the professional relationship is nearly oxymoronic, as most professionals (and certainly lead bankruptcy counsel) will find themselves *disqualified* from representing the estate if they have a substantial pre-bankruptcy relationship with the debtor. The question might have some modest relevance in our particular case, as the chapter 7 trustee here also serves as a trustee in numerous other cases in which, on occasion, he retains counsel. Still, it overall relevance to what fee should be awarded

It thus seems safe to conclude that the answer to the first question—the continuing vitality of the *Johnson* factors to fee awards under Section 330(a)(1) of the Bankruptcy Code—is that seven of the twelve factors are indeed relevant. In fact, the first two steps in the Fifth Circuit's *Copper Liquor* test for arriving at a lodestar are also consistent with the statute though there is still some debate whether "prevailing community standards" means the same thing as "comparable services other than in a (bankruptcy case"). And it seems safe to conclude as well that the remaining five *Johnson* factors are irrelevant in the bankruptcy context, for any purpose.

That leaves us with the remaining question—whether courts can ever (or should ever) get to the third step of the *Copper Liquor* test when making awards to professionals in bankruptcy cases. This court in *Farah* ruled that such adjustments—or enhancements—were permissible, but did not have the benefit of the Fifth Circuit's decisions in either *Shipes* or *Fender,* both of which were rendered after *Farah.* See *In re Farah,* 141 B.R. 920, 928–29 (Bankr. W.D.Tex.1992). Both of those Fifth Circuit cases note that (a) double counting is generally not permitted but (b) double counting may be okay in the "rare and exceptional" case. What is now obvious, however, is that, whenever fee enhancement is requested in a bankruptcy case, there are no *Johnson* factors to consult that have not already been counted once— and the remaining five are irrelevant and of no use to the analysis. Thus, if fee enhancement *is* permissible under the statute, it is *only* permissible in the "rare and exceptional" case that would allow the court to reexamine factors already considered in setting the lodestar, because there simply aren't any other relevant factors to look at. See *Shipes, supra* 987 F.2d, at 320 ("although upward adjustments of the

lodestar figure based on these factors [i.e., the factors used to originally arrive at the lodestar in steps one and two] are still permissible, such modifications are proper only in certain rare and exceptional cases supported by specific evidence on the record and detailed findings by the lower court").

The Bankruptcy Code itself makes no provision for fee enhancement for professionals retained under Section 327. What is more, while the sense of Congress was certainly to bring professionals up to rates charged by non-bankruptcy professionals for comparable services, it is questionable whether they intended to go any further. See *In re Gulf Consolidated Services, Inc.,* 91 B.R. 414, 418 (Bankr.S.D.Tex.1988) (suggesting that Congress' interest in paying a reasonable fee extended not only to "not paying too little" but also to "not paying too much").

Nonetheless, circuit courts have recognized the need for an "adjuster" designed to deal with the extraordinary circumstance when the ordinary lodestar analysis will simply not fairly compensate the professional, given all of the surrounding circumstances. See, e.g., *In re Manoa Finance Co., Inc.,* 853 F.2d 687, 688–89 (9th Cir.1988) (compensation awards under section 330 "may be enhanced only in exceptional circumstances where the applicant produces specific evidence that an award based on his standard hourly rate and actual hours worked *does not fairly compensate for the work done,* as is the purpose of the Kerr factors"). Fifth Circuit case law clearly supports an "upward adjustment" to account for the "rare and exceptional" case in the nonbankruptcy context. *Shipes,* 987 F.2d, at 320–21 (noting that the rare and exceptional case may justify enhancement to match what counsel would have expected to receive in the com-

seems attenuated at best. See *In re Temple Retirement Community,* 97 B.R. 333, 341 (Bankr.W.D.Tex.1989) (questioning the continuing vitality of *First Colonial* and its insis-

tence on the application of *all twelve* of the *Johnson* factors in arriving at fee awards in bankruptcy cases).

munity for such a result).[31] On at least one occasion, the Fifth Circuit has at least tacitly ruled that the same option is available in the bankruptcy context. *Transamerican Natural Gas Corp. v. Zapata Partnership, Ltd. (In re Fender)*, 12 F.3d 480, 487–88 (5th Cir.1994) (applying *Shipes* and its upward adjustment analysis, though reversing the lower court for its lack of findings showing that the case was, in fact, "rare and exceptional"). While it is true that the *Fender* decision did not explicitly address Section 330(a)(1), it is fair to presume the Fifth Circuit's familiarity with the statute. Its conclusion that upward adjustments of bankruptcy fees is at least possible is at least a tacit conclusion that the statute does not bar and is not inconsistent with the application of upward adjustment analysis under step three of the *Copper Liquor* test in bankruptcy cases—at least those bankruptcy cases for which the pre–1994 version of Section 330(a)(1) is controlling.

In conclusion, bankruptcy cases in this circuit to which the pre–1994 version of Section 330(a)(1) applies use the "lodestar" methodology set out in *Copper Liquor III*. Seven of the *Johnson* factors are relevant to arriving at the lodestar in steps one and two of *Copper Liquor*, as they are consonant with Section 330(a)(1). The remaining *Johnson* factors are, however, essentially irrelevant for any purpose. Thus, if further adjustments to the lodestar are to be made under the authority of *Shipes*, that may occur only if the bankruptcy court finds that the case is "rare and exceptional." If the court makes such a finding (and it must be factually supported), then the court may reexamine one or more of the seven relevant *Johnson* factors, and make an upward adjustment. *Shipes* also intimates that such an upward adjustment will be permitted only if the court further finds that charging and recovering an additional fee or kicker above normal rates is customary in the area in which the attorneys practice. *See Shipes*, 987 F.2d, at 320–22.[32]

## B. Post–1994 Lodestar and Adjustment Standards

■ The parties briefed Section 330 as it was amended in 1994. This case was filed (and converted) before the 1994 amendments became effective. Thus, interesting though both the briefs and the legal questions they discuss may be, the entire discussion is purely academic in the context of this case. Any thoughts this court might add in this decision would be purely advisory, and so are not appropriate. Questions about the continuing vitality of *Copper Liquor* under section 330 as amended (especially given the explicit standards laid out in section 330(a)(3)[33] of

---

**31.** In *Shipes*, it is worth noting, the court remanded for further consideration, directing the lower court to also look to see "whether it is customary in the area for attorneys to charge an additional fee above their hourly rates for an exceptional result after lengthy and protracted litigation." *Shipes*, 987 F.2d, at 322. Thus, if it is not "customary" for attorneys "in the area" (another kettle of fish) to charge "kickers" for their unexpectedly good results, then enhancement is still not permitted—yet another sensible brake on fee enhancements.

**32.** A number of issues still remain for resolution. There is a paucity of case authority for what might count as "rare and exceptional"— to say nothing of whether that question is asked as to the *case* or as to the *result* in the case. This question is revisited below in the discussion of VL's fees. In addition, the fore-

going analysis does not address the issue of "community standards" (the term used in step two of the *Copper Liquor* test) and "comparable non-bankruptcy services" (the phraseology used in Section 330(a)(1)). This issue is explored in the discussion of KGM's fees below.

**33.** The statute added the following new standards for measuring "reasonable compensation":

(3) In determining the amount of compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
 (A) the time spent on such services;
 (B) the rates charged for such services
 (C) whether the services were necessary to the administration of, or beneficial at

the amended statute), to say nothing of the continuing availability of upward adjustments under *Shipes*, must be left for another case and another day.

## C. APPLICATION OF SECTION 330(A)(1)

The three fee applications in this case raise different legal issues. KGM seeks adjustment of its fees in accordance with the hourly rate charged by the professionals in KGM's "community," as opposed to the normal hourly rate charged by the KGM's professionals to its other nonbankruptcy clients. The "adjustment" sought is a step two lodestar determination.[34] VL seeks a lodestar adjustment of its fees, to match the normal hourly rate charged by lawyers of equal experience in the firm, during the pendency of the bankruptcy.[35] VL then seeks a further $200,000 enhancement of that fee, essentially invoking step three of the *Copper Liquor* test. Kemp Smith seeks a lodestar adjustment of its fees, but must overcome the potential *res judicata* effect of this court's entry of an earlier "final order" (so denominated) on Kemp Smith's fees. In the alternative, Kemp Smith too seeks a fee enhancement. Although the Fee Examiner and the U.S. Trustee have voiced specific objections to each individual request, one objection that permeates the Fee Examiner's brief is that none of the applicants can qualify to receive an upward adjustment of any lodestar award for projects on which more than one applicant worked. That common issue will be addressed first.

### 1. COOPERATIVE WORK AND ITS IMPACT ON ADJUSTMENTS

The Fee Examiner points out that at least two applicants have requested a fee enhancement based on their success in representing the trustee in the following matters: 1) handling federal and state tax matters for the estate; 2) litigation with Bank Brussels Lambert; 3) litigation against Scurlock Permian Corporation; 4) handling Chevron's claims against the Debtor; and 5) handling negotiations with Term Lenders. While the resolution of these matters has significantly benefitted the estate, the Fee Examiner argues that when "results obtained" are attributable to the joint efforts of more than one professional, no single professional is entitled to an enhancement. In support, the Fee Examiner cites *In re Celotex Corp.*, 232 B.R. 484 (M.D.Fla.1998) and *In re First American Health Care of Georgia*, 212 B.R. 408 (Bankr.S.D.Ga.1997).

In *Celotex*, a bankruptcy court, in refusing to award an upward adjustment of a "lodestar" award granted to a law firm, had ruled *inter alia* that the exceptional results in the case were not a product of just the efforts of the applicant law firm, but were more properly attributable to the work of all the professionals involved in the case. *See id.* at 486. The district court affirmed, but did not discuss the issue of "cooperative work." *See id.* at 486–88.[36] In *First American*, the bank-

the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3) (as amended in 1994).

**34.** KGM raises a step three upward adjustment as an alternative ground for getting its

hourly fee up to its target rate of $250 per hour.

**35.** Note that, while KGM insists that the touchstone for arriving at "customary fee" should be the "community rate," VL is comfortable seeking the somewhat less controversial "nonbankruptcy client rate."

**36.** We thus know that the bankruptcy court relied at least in part on the notion that enhancement could not be awarded where the results might be attributable not just to the efforts of the professional seeking the adjustment but also to the efforts of other professionals (who may or may not be making such a request). We do not know whether the

ruptcy court found that the exceptional results achieved in the case were attributable in no small part to "exemplary cooperation" on the part of all professionals, but denied the fee enhancement on other grounds—most notably that there were apparently no unique or unforeseen obstacles and the results did not exceed any reasonable expectations so as to qualify the case as "rare and exceptional." *See id.* at 416.

■ Thus, neither *Celotex* nor *First American* can be read as specific authority for disapproving enhancements attributable to "cooperative" work. While appreciating the force of the logic behind the Fee Examiner's position (a given professional should not be able to take credit for a result that it cannot prove it "caused"), a court ought to be especially careful about announcing a rule on a matter as sensitive as fees that would in effect *discourage*

professionals in a bankruptcy case from cooperating with one another. Experienced bankruptcy professionals understand that cooperation is usually *essential* to the success of most reorganizations and liquidations. Compensation rules that encourage competition instead of cooperation (in order to be able to take credit for good results at the end of the case) are likely to generate a raft of cases with *bad* results. A better rule, the one adopted here, is that cooperation is not *ipso facto* grounds for denying a request for fee enhancement, though a court must be ever mindful of the potential for abuse.[37]

### 2. KGM

■ The Fee Examiner and the U.S. Trustee do not object to the application of the lodestar formula to Mr. Mott's and Mr. Gordon's rates. The parties disagree on the standard to be used to arrive at the

district court agreed with this analysis. We only know that the district court did not *disagree* to the point of finding reversible error.

**37.** The Fifth Circuit in *Consolidated Bancshares* lamented at what the court perceived to be a tendency for bankruptcy professionals to mutually support one another's fee applications, rather than to critically evaluate the fees sought by other professionals. Here's what Judge Jones, writing for the court, had to say:

Too frequently, court-appointed counsel for debtor and the official creditor committees' interests in a case, sharing the mutual goal of securing approval for their fees, enter into a conspiracy of silence with regard to contesting each other's fee applications (one bankruptcy judge characterized this process as a "massive backscratching exercise"). This is a violation of their duties as fiduciaries not only to their specific clients but to the interests of the debtor's estate. *In re Arlan's Department Stores*, 615 F.2d 925, 941 (2d Cir.1979). The numerous limitations imposed by the Bankruptcy Code upon compensation of court-appointed counsel, cited *passim*, are designed to insure the highest standards of ethical conduct and minimize the overhead expenses which can easily deplete a debtor's estate. Vigilance is required by and among court-appointed counsel in particular to enforce the standards of the Code. If such counsel

would scrutinize each other's fee applications with the dedication that they pour into preparing their own, the compensation scheme of the Code would be fully vindicated. At the least, they should inform the court in writing, as and when interim fee applications for other parties are filed, that they have reviewed such applications carefully, indicate whether or not such applications are reasonable and whether they are based on any impermissible grounds. Such a procedure could be reinforced or varied by the adoption of specific local bankruptcy rules; however, we believe that some such vehicle is necessary to screen and control any possible abuses of compensation and to compel court-appointed counsel to perform their fiduciary duty.

*Matter of Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1255 (5th Cir.1986). Much has changed since 1986, and some of Judge Jones' fears have not been borne out. To the contrary, firms today are increasingly willing to actively oppose what might be perceived as excessive fees, driven by the need to respond first to the desires of their clients. The universe of bankruptcy lawyers, especially in larger cities, is now sufficiently large that firms that charge excessive rates are no longer insulated from criticism or attack. Still, in a case such as this one, the tendency toward "back scratching" is likely to be much stronger—especially when two or more firms both stand to benefit from taking credit for the same results.

lodestar. The Fee Examiner and U.S. Trustee argue that a $250 per hour lodestar award to Mott's and Gordon's rates is excessive, because the controlling factor in a lodestar award is KGM's standard hourly rate for non-bankruptcy clients during the pendency of the bankruptcy ($195/200 per hour).[38] *Cf.* 11 U.S.C. § 330(a)(3)(E). According to KGM, however, the decisive standard for arriving at the proper lodestar award is the "community rate." [39]

Section 330(a)(1) directs a court, in setting the lodestar, to take into consideration "the cost of comparable services other than in a case under this title." 11 U.S.C. § 330(a)(1) (1978). The precise question presented here was addressed by this court in *In re Temple Retirement Community, Inc.*, 97 B.R. 333 (Bankr.W.D.Tex. 1989). After discussing Congress' intent to encourage competent counsel to practice in the bankruptcy arena by departing from the Act's emphasis on reduced rates and economizing, this court suggested the following alternative:

> If "reasonable compensation" means "not excessive," as it does in the disciplinary rule, then the focus on comparability should turn to the community or marketplace within which the services were rendered. The court must be guided not merely by what rate the applicant charges its nonbankruptcy clients, but by what range of rates is charged by attorneys of comparable competence for comparable services in the comparable community or market place. Thus, the appropriate question may not always simply be: "What do you charge your nonbankruptcy clients?" In many cases, the court should ask: "What is the range of rates charged by attorneys of comparable competence for comparable services in the comparable community or market-place?"

*Id.* at 342 (citations omitted). The *Temple Retirement* suggested standard is consistent with the Fifth Circuit's approach in *Copper Liquor* and its progeny, especially *Shipes* and *Fender.*[40] The same approach will be used here as well.

In this case, several "communities" could be used for arriving at a prevailing market rate for purposes of setting KGM's lodestar. El Paso, Texas commends itself as the relevant legal community, as El Paso Refinery is located there, KGM is based in El Paso, and the chapter 7 case is pending in the El Paso Division of the Western District of Texas. However, an argument could also be made that the relevant community is the entire Western District of Texas (which includes Austin and San Antonio), as the case is pending in the Western District, the case was originally pending in the Austin Division, many hearings are conducted in San Antonio, and KGM practices throughout the Western District. The relevant community could also be the State of Texas, as KGM practices throughout the State of Texas,

---

**38.** *See* KGM Exhibit 5, Scenario # 1, for a breakdown of this calculation.

**39.** The statute, it will be remembered, directs the court to arrive at "reasonable compensation" for the professional. *National Gypsum* at least suggests that the statute will set the outer boundary for arriving at that rate. *Copper Liquor*, in its second step, seems to suggest a firm's client rate as the starting point, but the Code seems instead to harken to a "community standard."

**40.** The Fifth Circuit, as well as the Ninth Circuit, has placed special emphasis on prevailing "community rates" when developing a lodestar. *See Fender*, 12 F.3d at 487 ("the lodestar is computed by multiplying the number of hours reasonably expended by the *prevailing hourly rate in the community for similar work*") (emphasis added); *Shipes v. Trinity Industries*, 987 F.2d 311, 319–20 (5th Cir.) *cert. denied*, 114 S.Ct. 548 (1993) (the court must "select an appropriate hourly rate based on *prevailing community standards for attorneys of similar experience in similar cases*") (emphasis added); *Matter of Lawler*, 807 F.2d 1207, 1211 (stating the same as *Fender*); *see also In re Cedic Development Co.*, 219 F.3d 1115 (9th Cir.2000) (lower court's premise that attorneys' standard hourly rate should be used to calculate lodestar award was in error).

and numerous lawyers in this bankruptcy case are from various cities in the State of Texas. The community could even be the southwest region of the United States, or even the entire nation, given the location of opposing attorneys and major creditors involved in the chapter 7 case, as well as the scope of KGM's practice. The case drew significant involvement of lawyers who practice nationwide, including counsel from Baker & Botts, Vinson & Elkins, Jones Day Reavis & Pogue, and Weil, Gotshal & Manges. Indeed, had any of those firms been retained by the estate, one could legitimately ask whether it would appropriate under the Code to hold their rates to those normally charged to business clients in El Paso, Texas.

Neither *Fender* nor *Shipes* define what "community" should be used in determining rates. *See Fender,* 12 F.3d at 487; *Shipes,* 987 F.2d at 319. Citing *In re Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish School Board,* 919 F.2d 374, 378 (5th Cir.1990), the Fee Examiner argues that the relevant "community" is that in which the fee applicant works. *Associated Builders,* however, is not as clear on the point as the Fee Examiner's brief suggests. In that case, the district court had based its award on the "attorneys' customary fees" and those fees were held to be "within the prevailing market rates for the community." *Id.* at 379. The circuit court did not *require* that the local community be the one selected for purposes of making the comparison. It merely held that it was not error for the lower court to use the local community as the standard.

In *Lawler* the Fifth Circuit stated: "No expert testimony was required as to the current hourly rates for attorneys since the bankruptcy and district courts are already very familiar with prevailing community standards." *Id.* at 1212. For a bankruptcy judge, that familiarity often extends beyond the city in which the case is pending. The judge presiding over this case has familiarity with the prevailing

community standards not only of El Paso but also of San Antonio, Austin, and even Waco. Certainly El Paso qualifies as *an* appropriate community, but it is less certain that it *must* be *the* appropriate community for purposes of setting KGM's rates.

Lacking any other standard, this court chooses to rely on its earlier standards set out in *Temple Retirement* for settling on the relevant "community" for purposes of setting KGM's lodestar award. *See In re Temple Retirement Community,* 97 B.R. 333 (Bankr.W.D.Tex.1989). In most civil litigation matters, "the community whose standard is applied ... is normally presumed to be the local community in which the services are rendered." *Id.* at 342 (citing Texas Code of Professional Responsibility, DR 2–106(B)(3), State Bar Rules, art. 10, § 9, reprinted at 3 TEX.GOVT.CODE, Title 2, Subtitle G, appendix (Vernon 1988)). Nonetheless,

[m]any bankruptcy cases are often more regional or even national than they are local in scope, so that looking solely to the local community's range of rates would impose an unnecessarily parochial cap on the case. In addition, bankruptcy is sufficiently specialized that a firm with the skills necessary to meet the needs of a particular debtor might not be available in the local community.... A firm may be justified in recovering their own normal rate in a given case, as opposed to the local rate in the city where the case is pending, when the circumstances of the case justify bringing in outside counsel, as was done here.... Not every case warrants going outside the local community for representation. When the nature of a given case in fact justifies the retention of out-of-town counsel, however, local rates should not operate as a limiting factor in determining the reasonableness of the base fee sought.

*Id.* at 342–43 (internal citations omitted). In short, if KGM were based in a city such as Dallas, and El Paso did not have any

attorneys which could competently handle the complexities of this case, then, following the standards set out in *Temple Retirement*, this court would be justified in granting KGM fees in excess of those typically charged in El Paso. At the hearing on this application, however, KGM admitted not only that it was competent to handle the case, but also that several other attorneys in El Paso were also qualified to handle the case. Thus, the circumstances surrounding this case do not justify the application of a "community rate" other than El Paso, where the case was pending.[41]

The burden of proving what constitutes "reasonable compensation" is upon the party requesting the compensation. *See In re Farah,* 141 B.R. 920, 923 (Bankr.W.D.Tex.1992). Accordingly, KGM also bears the burden of proving the prevailing "community rate" in El Paso. KGM Exhibit 3[42] set forth the average billing rates for numerous Kemp Smith attorneys in El Paso in 1992 and 1993. The standard hourly billing rate for shareholder attorneys (notably both bankruptcy and comparable non-bankruptcy attorneys) from that firm all exceeded $200 an hour, and attorneys of equivalent experience with Mott and Gordon charged at least $250 an hour. This evidence satisfied KGM's burden of proof with respect to establishing the community standard for rates charged by attorneys with like or similar experience as Mr. Mott and Mr. Gordon. This court finds that $250 per hour qualifies as "reasonable compensation" for purposes of determining a lodestar award under Section 330(a)(1) for KGM.[43] Accordingly, KGM is awarded an increase in compensation to an equivalent of $250 an hour for services rendered by H. Christopher Mott and Patrick R. Gordon of KGM through February 2000, yielding a total increase in fees of $477,925, in order to arrive at "reasonable compensation" award within the meaning of § 330(a)(1).[44]

### 3. VL

VL's request raises two issues: whether VL can obtain a recomputation of its lodestar award,[45] and whether VL is entitled to an $200,000 upward adjustment of its lodestar award.

#### (a) VL's Lodestar Award

In this case, VL has set forth what it deems to be "reasonable compensation" on page 3–4 of its Brief. Its materials seek an adjustment of its lodestar to a rate consonant with the hourly rates the firm charges its other clients outside of this bankruptcy proceeding. VL is a

41. The court did not reach the precise issue raised by the facts of this case in *Temple Retirement.* An argument can be made, of course, that *Temple Retirement* should not be restricted to its facts, and that the rationale that justified charging a "Dallas rate" in Waco, Texas could apply equally to this case, even though the client did not have to seek an out-of-town firm to do the work performed by KGM. Indeed, as it turns out, the Trustee *did* have to turn to out of town counsel (Verner Liipfert) to handle the sheer breadth and complexity of legal work this case generated. The Trustee then had to hire a local firm to supplement that work (to act as local counsel, to handle matters in which VL had a conflict, and the like). Most of the work done by the local firm was of a quality equal to that furnished by VL. *Temple Retirement* certainly does not stand for the proposition that, if a given firm is from the same community in which the case has been filed, then the firm is disqualified from being paid at rates being paid to other professionals in the same case who *do* happen to come from out of town.

42. Admitted into evidence at the hearing.

43. The lodestar calculation discussed here is limited to comparison to comparable non-bankruptcy services in El Paso, Texas. However, the selfsame rate is independently justified under the seven relevant *Johnson* factors.

44. In light of this disposition, it is unnecessary to reach KGM's alternative upward adjustment request.

45. If VL succeeds in convincing the court that its lodestar should be recomputed, VL believes it will be entitled to receive an additional award in the amount of $278,463.50.

Houston-based firm,[46] raising the *Temple Retirement* issue more squarely.[47] However, VL has made the court's job much easier by restricting its lodestar request to its own internal rates (rather than to Houston community rates), because that rate structure compares favorably to the rate structure in El Paso, Texas for lawyers of comparable experience and ability.[48] Accordingly, VL's request for a lodestar adjustment, resulting in an increase in its award by $278,463.50, is warranted.

### (b) Can VL Receive a Further Upward Adjustment?

VL also ask for a $200,000 bonus or enhancement over and above the lodestar award. VL deems an upward adjustment of its fee award appropriate for any one of three reasons: (1) this court has already promised VL an enhancement; (2) VL could apply its current hourly rate to the entire 7 years, resulting in an upward adjustment of $600,000; thus, VL is being nice by only asking for a $200,000 enhancement; (3) an enhancement is warranted under the standards propounded in the Fifth Circuit.

### (1) This Court's Retention Order.

■ By Order entered March 7, 1994, this Court approved VL's retention as general counsel to the Trustee (the "Retention Order"). The Retention Order approved, in relevant part, VL's employment at discounted rates and further provided, "VLBM & H may seek an enhancement of its fees at the conclusion of the case, based on results, to a level equal to or exceeding its normal hourly rates." *See* Retention Order. Based on this language, VL argues that it is now entitled to an enhance-

ment of its fees. *See* VL's brief, ¶ 11. At the September 21, 2000 hearing, VL argued that it would not have assumed the many risks in this case even at its normal hourly rate without this enhancement *proviso*.

VL's arguments are grounded in *Matter of National Gypsum Co.*, 123 F.3d 861 (5th Cir.1997). In that case, as noted above, the bankruptcy court approved the retention of counsel at a proposed hourly rate. *See id.* at 862. However, when the final application was made for fees in an amount the same as the amount set out in the retention application, the bankruptcy court lowered counsel's fees "in the light of hourly compensation that had been allowed in similar bankruptcy cases in the same district." *Id.* The Fifth Circuit reversed, holding that, once a bankruptcy court approves a compensation agreement under Section 328, the court "must protect those agreements and expectations" unless modification is warranted by unforeseen events. *See id.* at 862–63; *see also* 11 U.S.C. § 328(a). The retention approval was held to have clearly established the terms of employment by court order, and could not be altered *ex post. Id.*

The Retention Order in this case does not, by its terms, *guaranty* an enhancement award. It simply *preserves* counsel's ability to come back and ask for more at the end of the case. *National Gypsum* confirms the wisdom of counsel's having obtained that proviso in the Retention Order for, without it, VL might well have been *barred* from any further upward adjustments, under the authority of (ironically) *National Gypsum*.[49] The court satis-

---

**46.** Actually the firm's main offices are in Washington, D.C. All of the lawyers who performed services in this case work out of the Houston office.

**47.** It will be recalled that the precise issue in that case was the propriety of a Dallas firm's recovery of its Dallas rates in a Waco bankruptcy proceeding. *See Temple Retirement*, 97 B.R., at 342.

**48.** Compare VL's Application for Fee Enhancement by Trustee's General Counsel, VL, pages 3–4, with Kemp Smiths' Application for Fee Adjustment, page 7.

**49.** The Fifth Circuit had ruled in *National Gypsum* that the language of Section 328(a) itself erected the bar to the court's revisiting the fees in that case. The statute in fact says that "... the court may allow compensation *different* from the compensation provided ...

fied the obligation imposed in the original Retention Order by affording VL a forum in which to make the request. Nothing in that order could be fairly construed to bind the court to *grant* whatever VL might later ask for.

### (2) Application of the *Lawler* decision.

At the September 21, 2000 hearing, VL argued that *Lawler* mandates that VL is entitled, as a matter of law, to seek a lodestar adjustment of its fees charged throughout the seven year bankruptcy at the rate VL charged in the last year of its service.[50] By this standard, VL would be entitled to a lodestar award of $600,000 (*i.e.*, an award determined *before* reaching the step three "enhancement" or upward adjustment). In asking for a fee enhancement of $200,000, VL says that the resulting award would actually be *lower* than what would otherwise be the proper lodestar award under *Lawler*. In other words, because VL is not requesting the lodestar award to which it believes it is entitled (which would increase its fees by $600,000), the court should not hesitate to grant VL the much more humble enhancement request of $200,000.

■■■■ The practicalities of the rationale VL advances are indeed compelling. However, the Fifth Circuit's decision in *Shipes* forecloses recourse to such policy-driven arguments. Bankruptcy courts are constrained to *first* determine whether the case is "rare and exceptional" as a predicate to making any adjustment to the lodestar award. *See* discussion *supra*. The fact that the professional *could have* argued for a higher lodestar (and hence the alternative enhancement request is "a good deal" that should not be passed up) is simply not part of the calculus permitted to the court.[51]

### (3) Enhancement under the Applicable Judicial Precedents

■■■■ Finally, VL argues that it is entitled to a $200,000 upward adjustment of its lodestar award, pursuant to applicable case law. On this point, VL is correct that the relevant case law indeed permits fee enhancements, provided the necessary factual predicate is laid. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Shipes, supra* at 323. Upward adjustments in bankruptcy cases are permissible, provided the applicant shows that the case was "rare and exceptional." Upon such a showing, the applicant must then demonstrate, by spe-

---

if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated ..." 11 U.S.C. § 328(a) (emphasis added). The bar that the statute erects prevents not only later *reductions* but also later *increases* absent the requisite showing of improvidence and inability to anticipate.

50. In *Lawler*, counsel was permitted to retroactively apply his then-current rate across the 11 years worth of services he had performed for the estate. *See Matter of Lawler*, 807 F.2d 1207, 1211 (5th Cir.1987).

51. It is far from certain that the *Lawler* decision would in fact compel a similar result in this case. *Lawler* involved an eleven year bankruptcy battle. *See Lawler*, 807 F.2d, at 1212. At the end of the case, applications for attorneys' fees were filed *for the first time.* Citing *Graves v. Barnes*, 700 F.2d 220, 224 (5th Cir.1983), the *Lawler* court affirmed the lower court's award, calculated at the attorneys' then current rate, for the entire period of the case. *See id.* However, *Lawler* added, the "[a]pplication of ... present rates in this case compensates [counsel] for the delay in payment." *Id.; see also Graves v. Barnes*, 700 F.2d, at 224 (citing *Copeland v. Marshall*, 641 F.2d 880, 893 n. 23 (D.C.Cir.1980)) (en banc) (where "the lodestar itself is based on present hourly rates, rather than on the lesser rates applicable to the time period in which the services were rendered, the harm resulting from delay in payment may be reduced or largely eliminated"). Counsel in this case, by contrast, were not only allowed payment on an interim basis, but were also excused from having to file formal fee applications in order to obtain interim payment (interim fee requests were examined by the Fee Examiner). While it is true that VL was paid *less* than what it was entitled to receive for the seven years in which it worked for the trustee, at least it was paid *something*.

cific evidence, that "the quality of representation was superior to that which one would reasonably expect in light of the fees claimed. The 'results obtained' factor is one of the more significant factors in determining whether the circumstances of the case are so 'exceptional and rare' as to warrant a fee enhancement." *Farah,* 141 B.R. at 924–25 (citations omitted); *see also Shipes,* 987 F.2d, at 321–22.[52] The "rare and exceptional" standard for evaluating so-called "fee enhancements" or the more properly denominated "upward adjustment" of the lodestar has become the accepted standard in the case law. *See In re Apex Oil Co.,* 960 F.2d 728, 732 (8th Cir. 1992); *Matter of UNR Industries, Inc.,* 986 F.2d 207, 209–10 (7th Cir.1993); *In re Big Rivers Elec. Corp.,* 252 B.R. 676, 682 (W.D.Ky.2000); *In re Celotex Corp.,* 232 B.R. 484, 487 (M.D.Fla.1998); *In re Poseidon Pools of America,* 216 B.R. 98, 100 (E.D.N.Y.1997); *In re Meronk,* 249 B.R. 208, 214 (9th Cir. BAP 2000); *In re Kula,* 213 B.R. 729, 738–39 (8th Cir. BAP 1997); *In re Vista Foods USA, Inc.,* 234 B.R. 121, 128 (Bankr.W.D.Okla.1999); *Matter of First American Health Care of Georgia, Inc.,* 212 B.R. 408, 414 (Bankr.S.D.Ga. 1997).

Courts have not laid down clear (or even consistent) guidelines for what might make a case "rare and exceptional," however. This court in *Farah* focused on positive results obtained, results which were unexpected at the time of retention. The court's findings detailed how the applicant (debtor's counsel) was able to resolve by negotiation a bitter dispute, resulting in the elimination of a large claim against the estate and the conferral of substantial benefits on the debtor as he emerged from bankruptcy. Counsel was also able to eliminate a very large claim held by a very recalcitrant creditor (the FDIC), and to preserve from numerous attacks the most significant asset in the estate, some publicly traded stock. The case started with a best case scenario of a 5% recovery for unsecured creditors, and finished with their payment in full, with interest.[53]

Some courts have suggested that the *sine qua non* for finding a case to be rare and exceptional, for purposes of a fee enhancement award, is full satisfaction of all creditors. *See, e.g., In re D.W.G.K. Restaurants,* 106 B.R. 194, 197 (Bankr. S.D.Cal.1989). In *Apex Oil,* the court found the following factual matters relevant to whether an examiner's lodestar award should be adjusted upward: (1) the examiner in that case engineered a complex settlement among secured creditors which avoided the estate's incurring expensive, time-consuming litigation that would no doubt have destroyed any chance for reorganization; (2) the examiner created a claims resolution facility which effectively dealt with the hundreds of personal injury lawsuits then pending against the debtor's estate; (3) the examiner was instrumental in obtaining eventual court approval for the sale of the debtor's most significant asset; and (4) the examiner also fulfilled his traditional role of examining the debtor's affairs. *In re Apex Oil Co.,* 960 F.2d

---

**52.** Thus, the results obtained in a case will tend to show *both* that the case was in fact rare and exceptional *and* that the result that warrants that showing can be attributed to the services of the applicant. *Farah,* 141 B.R., at 925.

**53.** A later court described the ultimate outcome in *Farah* as "serendipitous," as the payout resulted from the appreciation of the publicly traded stock held by the debtor. *See In re Big Rivers Electric Corp.,* 252 B.R., at 686. In truth, debtor's counsel (and many other parties in the case) were well aware of the substantial increase in value the stock was likely to realize in the short term due to restructuring changes at the corporation, Farah, Inc. The stock was pledged to the FDIC, which was uninterested in waiting for the expected upturn and more interested in immediate recovery of its collateral. Debtor's counsel's efforts at fending off the FDIC's efforts contributed significantly to the eventual outcome of the case. The author of this opinion was also the author of that opinion, and apologizes to later readers who may have found the written opinion insufficiently enlightening to explain the court's ultimate ruling in that case.

728, 732 (8th Cir.1992). Yet no clear guidelines emerge from what appears to be a particularly fact-intensive (and some might say an *ad hoc* ) decisionmaking process. The difficulty for courts (and practitioners) in divining a predictable rule of decision can perhaps be traced to a certain amount of confusion over precisely *why* a court would ever entertain an *upward* adjustment of an award that was, after all, already deemed to constitute reasonable compensation for services rendered.

The Eighth Circuit seems to have offered a valid answer to the "why" question in *Apex Oil.* The court remanded the upward adjustment issue because the lower court had failed to relate the examiner's services and results to those of similarly situated professional who were performing comparable services and who were charging rates comparable to those charged by the examiner. The court explained that "[i]f the [lower] court concludes that [the examiner's] lodestar fee did not reasonably compensate him for his services, in light of its exceptional quality and the results obtained, an enhancement is appropriate." *Id.* The Eighth Circuit thus essentially ruled that enhancement is another way to assure that the professional is appropriately compensated (without being overcompensated), in light of the circumstances.

Seen in this way, enhancement is not a bonus, but merely another way to arrive at a comparable rate. The ruling in *Apex Oil* parallels the thinking of the Fifth Circuit in *Copper Liquor III*, discussed *supra.* It is also echoed in a Seventh Circuit decision, *UNR Industries*, where that court made the following telling observation:

> We would emphasize that section 330 of the Bankruptcy Reform Act of 1978 requires lawyers in bankruptcy matters to receive the same compensation as they would earn in performing similar services outside the context of bankruptcy. Outside bankruptcy, business lawyers charge their clients at an hourly rate and there is no evidence that they often receive an enhancement for quality.

*Id.* at 210. Similarly, the *Big Rivers* district court ruling which reduced an enhancement award to an examiner in that case pointed out that section 330 was not designed to confer a windfall to bankruptcy lawyers (or other professionals in bankruptcy cases, for that matter). *In re Big Rivers Elec. Corp.*, 252 B.R. at 686.

The thrust of the inquiry, then, is whether the surrounding factors of the case are such that, even after having arrived at an appropriate lodestar, a court would still be constrained by the facts to conclude that the resulting hourly rate is *still* too low to fairly compensate the professional, as that professional would be compensated in the non-bankruptcy context for delivering a similar outcome.[54] Two sorts of facts must therefore be adduced from the record: (1) facts setting this case apart for special consideration and (2) facts showing that other comparable professionals operating outside of the bankruptcy arena would be able to recover a higher fee from their clients as a result.[55]

---

**54.** This sort of "revisiting" may seem like the very kind of double-counting that is so often criticized in the case law. In fact, however, it may be the only fair way to truly evaluate fees in bankruptcy cases, because the process of bankruptcy is such that the real value of the services will often not be realized until the conclusion of the case. During the course of the case, however, fee are typically awarded on an interim basis, using precisely the same standard of "reasonable and necessary" as is used to make final fee awards. Thus a lodestar is *de facto* developed over the course of the case. Only at the end of the case, however, will a court be able to see whether that lodestar was in fact too low (or, for that matter, too high—leading to a disgorgement order).

**55.** The precise wording is important. The issue is not whether a comparable *firm* would reward its partners and employees for bringing in a good "result" (defined usually in terms of enhanced revenues for the firm) but whether the *client* would feel obliged to pay the *firm* a higher rate in return for a "rare and exceptional" result. In the usual case, it is this court's understanding that such "kickers" are negotiated in advance of the engagement. To the extent that a similar "advance

A particular difficulty in this case is that little or no evidence was presented in this second category.[56] Substantial evidence was presented on the first issue, however.

■ Through May 2000, VL spent a total of 15,228.50 hours working on this case. VL did not charge for its travel time to and from Houston (where its attorneys office), and many hours were never charged (and so never showed up on the billing sheets), a demonstration on the part of VL of appropriate "billing judgment." *See Temple Retirement, supra.* The sheer amount of time invested in the case was substantial, but was all the more impressive given that a number of attorneys at the firm were convinced to spend time on what then appeared to be an engagement that would not pay, time that they could otherwise have spent on other, presumably paying clients. For at least the first year of the engagement, this decidedly dark picture of the future made the case less than desirable for the firm (and more difficult to staff as a result). The estate entered chapter 7 administratively insolvent, with liabilities exceeding assets by a factor of more than two to one.[57] What is more, many of the assets were of a speculative quality—litigation that had to succeed, preferences the avoidance of which had to be sustained, and such. At least three claimants—the IRS, SPC and BBL—were committed to terminating the case as soon as possible. Certain unsecured creditors had a guaranteed reservoir of $7 million to which to look (as a result of a provision of the Term Sheet), funded by the Term Lenders, and unsecured creditors were selling their claims at between 10 cents and 20 cents on the dollar. Indeed, VL only agreed to be retained if it were permitted to insert an "enhancement" proviso in the retention agreement—because the partner in charge of the engagement needed to "sell" the engagement to his partners.

The results in the case well exceeded everyone's expectations at the time the case was converted. Thanks in considerable part to VL's work, the estate was able to gain the essential access it needed to cash collateral to allow it to pay limited ongoing expenses for a sufficient amount of time to allow for the negotiated sale of the TM & S subsidiary to Diamond Shamrock, and to permit the zealous pursuit of litigation important to the estate. What is more, VL's entry into the case marked a decided shift in the "tone" of the case from sharp-edged to solution-minded. VL's partner in charge of the engagement, John Melko, was able to significantly reduce the "temperature" of the case so that a level of trust could be developed, leading to the possibility of productive negotiation instead of unproductive litigation.[58]

> While [VL's] Application sets forth the objective successes occasioned by VL's superior representation, it does not in any way described what the Trustee views as one of VL's most important contributions to the success of the case. As reference above, the Chapter 11 was intensely bitter and contentious. A lack of trust permeated the proceeding. That changed with VL's insertion into the case. The Trustee would single out the efforts of VL's lead counsel, John P. Melko, in fostering a sea change in attitude. Following VL's appointment as counsel to the Trustee, the bitterness subsided. While the case was vigorously pursued and contested, the line between zealous representation and rancor was never again crossed. Mr. Melko's professionalism helped fuel the proceeding and ultimately led to many of the estate's successes.

agreement" might be seen as a prerequisite, in order to bring our analysis into line with what happens in the marketplace outside of bankruptcy, the facts show that VL "negotiated" for just such a "kicker" in its original retention papers.

56. VL can hardly be blamed for any "failing" in this regard, as the case law is sufficiently murky that one would be hard pressed to glean from it any clear roadmap for evidence presentation on such applications.

57. When VL accepted representation of this case, the estate had assets of $35,036,000 and liabilities of approximately $84,980,916. *See VL's Brief, para. 20.*

58. In his brief in support of VL's application, the Trustee stated:

VL worked on at least 41 discrete matters for the Trustee in this case, including resolution of the Santé Fe Pipeline litigation insofar as the objections of the estate's general partner (and its principals) threatened to derail settlement of that particularly valuable asset.[59] VL represented the Trustee in contested claims litigation with UOP, settlement of the estate's interests in the M & M lien litigation (especially with Glitsch)—reducing the estate's exposure from $13.4 million to just $1 million. VL also helped the Trustee recover nearly $2 million in preference litigation (not counting the SPC preference action, which was handled by Kemp Smith). VL's claims work reduced the estate's liability from over $100 million to approximately $20 million. Overall, it can safely be said that lawyer assistance from VL added significant value to an estate that had little prospects for generating any value shortly after conversion of the case.

One court has suggested that another way to think about what makes a case rare and exceptional is to focus on three factors that might be present:

(1) Whether the professionals encountered unique or unforeseen obstacles;

(2) Whether the results far exceeded reasonable expectations at the outset of the case;

(3) Whether the party paying the fee consented to the enhancement request.

See *In re First American Health Care of Georgia, Inc.*, 212 B.R. 408, 416 (Bankr. S.D.Ga.1997). All three factors are present in this case. While VL had every reason to expect resistance to the Trustee's efforts to use cash collateral, it had less reason to think that the case would take as long as it has, that it would have encountered the stiff resistance of Messrs. Jones and Shelton, who were the princi-

pals of the general partner of the debtor estate, or that the entire success of the case might be derailed at the end by the environmental litigation that cropped up.[60] The results in the case were certainly not expected by anyone in the case, and, though the credit for those results has to be shared, it is safe to say that those results would not have been achieved at all but for the unique blend of skill, diplomacy, preparation, negotiating prowess and sheer investment of time that John Melko especially brought to bear on behalf of his client. Finally, the retention agreement itself memorialized the consent of the Trustee well in advance to VL's seeking an enhancement if, as and when VL produced a result worthy of such a request.

The facts of the case thus support a conclusion that this case was (and is) indeed rare and exceptional, not only as chapter 7 cases go but as bankruptcy cases in general go. Remaining allowed claims have been paid in full and are now awaiting a possible post-petition interest payment in what was generally expected to have been an administratively insolvent estate. All of the significant litigation has been settled (save and except outstanding appeals on one piece of environmental litigation with a successor to the Term Lenders), the secured creditors are out of the picture (as is the IRS), claims adjustment has been completed, as have avoidance actions. True, the master limited partnership interests of the "investors" (their status as either equity or creditor interests has never been formally determined) remain unsatisfied, but it was highly unlikely that they would ever have been paid in any event.

The second set of facts that a court ought to look at, according to the cases, is whether other firms producing similar re-

---

*See para. 8 of Trustee's Brief.*

**59.** The settlement yielded about $16 million to the estate.

**60.** The court does not here suggest that VL either is or should be taking credit for the

environmental litigation in this case. The lion's share of that effort was done by KGM. But the environmental litigation was certainly not foreseen, and has had an adverse impact on VL's ability to get paid.

sults in the non-bankruptcy context would be able to recover from their clients an additional fee or "kicker." [61] The assumption behind that second set of facts is that the lodestar rate still falls short of a comparable non-bankruptcy rate for the nature of the services rendered, given the ultimate results obtained, and that the nature of those services would justify a kicker to arrive at that comparable rate. However, if the lodestar at which the court has arrived is still "short," then in a real sense one could say that the court has "not yet arrived" at the correct lodestar—never mind a "kicker." This may be one of those kinds of cases.

VL has been paid $2,049,907.50 for its services in this case, and in the previous section of this opinion, VL has been awarded an additional $278,463.50 to bring its lodestar award to $2,328,371.00 at an average hourly billing rate of $152.89. The further upward adjustment of $200,000 would add less than 8.6% to the fee—an upward adjustment in the hourly rate of just $13.15. The total blended rate would thus be $166.04. While the applicant has not yet furnished any evidence regarding whether clients in transactional cases pay their Houston lawyers "kickers" for extraordinary results, the court is already familiar with the range of fees charged on significant engagements by firms of the size and reputation of VL—and it is still well over $166 an hour, even at a blended hourly rate.[62] Frankly, the additional evidence about "kickers" would be largely irrelevant, given this finding.[63]

In summary, based on the foregoing specific evidence in the record and findings of fact, a $200,000 upward adjustment of VL's lodestar is warranted (perhaps it is even essential in order to arrive at the proper compensation for VL, given the ultimate outcome of this case).

### 4. KEMP SMITH

Kemp Smith's fee application turns on this court's use of the term "enhancement" in the November 22, 1999 final order which made what then purported to be a final fee award to Kemp Smith for its services in this case. The order stated that it was "a final order except to the extent to which this Court would award any fee enhancement to professionals at the conclusion of the case." The term might mean that the court intended to permit KS to seek a further adjustment of its lodestar award ("step two" of *Copper Liquor III*). Or, alternatively, it might mean only that KS could seek an upward adjustment of its original award ("step three" of *Copper Liquor III*). If it means the latter, then KS's application would have to survive scrutiny under the "rare and exceptional" analysis originally laid out in *Shipes* and as further elaborated above.

#### (a) CONSTRUING THE NOVEMBER 22 FINAL ORDER

■■■ The November 22 order purported to be a "final order" on KS' fees in this case, to be distinguished from the numerous "interim" awards previously sought and (to some extent) paid in this case. Generally, a final fee application will not be revisited by the bankruptcy court, even if there remain other administrative

---

**61.** Again, the choice of terms is intentional here. The court refrains from using "bonus" because that word connotes the sort of payment an employer pays its employee—or a law firm pays its partners and associates. In the professional/client context, "bonus" seems inapropos.

**62.** Fees being billed by VL's opponents in the case generally ranged between $250 and $300 an hour, a strong indication that the estate got superior representation in light of the fees requested by VL.

**63.** If VL feels constrained to supplement the record nonetheless, it is invited to submit affidavits from other law firms in Houston on the point, which may then be filed of record as supplements to VL's application. Other interested parties will have 10 days in which to contest any such affidavit, and to request the opportunity to cross-examine the affiant in open court.

matters in a case.[64] The presumed finality of such orders casts considerable daylight on the court's use and intentions with respect to its use of the word "enhancement" in the order. All final orders granting awards to professionals pursuant to Section 330(a)(1) are presumed to have included the court's findings required to support that award. Normally, the fee application itself sets out evidence sufficient for a *prima facie* case that the final fee award sought to be approved is both reasonable and necessary within the meaning of the statute. As noted earlier in this decision, such a finding closely parallels steps one and two of *Copper Liquor III* and more recent Fifth Circuit authority essentially equates such a determination with the lodestar analysis. *See Matter of Texas Securities, Inc.*, 218 F.3d 443, 444 (5th Cir.2000). Thus, it seems safe to say that the very entry of the order without opposition by any party establishes that the court has *already* made its "lodestar" award within that final order.[65]

■ The reservation contained in an order otherwise denominated as "final," leaving open the option to come back to the court at a later date to request "enhancement," can only refer to the sort of "fee enhancement" contemplated in step three of *Copper Liquor III* and in *Shipes*—an upward adjustment from the lodestar. The word "enhancement" is itself a term of art coined in the case law (including this court's own case, *Farah*), and usually refers to that upward adjust-

ment step. Moreover, enhancement by its nature must await the completion or near completion of the case, for it is not possible to know with any certainty whether an enhancement is warranted until the case is nearly completed, so that the court can evaluate the all-important factor—results obtained. The order's preservation of the right to come back "at a later date" is consistent with how "enhancement," in the sense of "upward adjustment," is supposed to work. Thus, "enhancement" as that term is used in the November 22 final order on KS' fees, refers to the step three upward adjustment contemplated in *Copper Liquor III* and *Shipes*, and not to the step two "setting" of the original lodestar.

Given the foregoing, it is unnecessary to decide whether *res judicata* bars revisitation of the original lodestar award made in the November 22 final order. The order gave KS the right to seek an enhancement, or upward adjustment, of its final fee award. It has now filed a pleading asking for just that—an enhancement. The court construes the request to be consistent with the language of the November 22 final order, and thus evaluates it on the merits as a request for an "upward adjustment" of KS' fees.

## (b) UPWARD ADJUSTMENT OF LODESTAR AWARD

■ KS has been awarded $624,336.08 in fees for services rendered as special counsel to the Trustee for the period from

---

64. There are, of course, exceptions. For example, a final fee award would not prevent a court from later ordering disgorgement of fees on a subsequent showing of wrongdoing (such as, by way of example, a failure to disclose a conflict of interest). *See, e.g., Matter of Southmark Corp., see also Matter of Lockwood Corp.*, 216 B.R. 628 (Bankr.D.Neb. 1997) (holding that, so long as chapter 11 proceeding remained open, court could revisit fees awarded for purposes of disgorgement). Too, a final fee award does not necessarily assure payment in full, as all competing claims of equal priority might exhaust the assets available for distribution, requiring *pro rata* distribution. *See* 11 U.S.C. § 726(a)(1).

65. Certainly KS knew—or should have known—that a professional filing a fee application denominated as final in a bankruptcy case is afforded its one last opportunity to ask for everything to which it believes itself justly entitled. While it is a theoretical possibility that a court might *sua sponte* rule that the lodestar requested by the professional is too low and needs to be raised, it is certainly unlikely to happen in the vast majority of cases. Thus a court would normally be safe in assuming that the fees requested (and the rates at which they are requested) represent what the professional itself believed to be a proper lodestar award for its services.

November 1993 through July 1999. In addition, KS recovered a contingent fee from its work in state court litigation against SPC (an arrangement for which it contracted). At the outset, recent Fifth Circuit case authority confirms that no upward adjustment is available with respect to the contingent fee award. *See Matter of National Gypsum Co.*, 123 F.3d 861, 863 (5th Cir.1997); *Matter of Texas Securities, Inc.*, 218 F.3d 443, 444 (5th Cir.2000). The contingent fee award was set pursuant to Section 328 and cannot be revisited under Section 330(a)(1)—whether to later lower the fee (as was sought in *Texas Securities* ) or to later raise the fee (as is being requested here). Section 330(a)(1), and enhancements, do not apply there.

▪▪▪ As to the balance of the fees, KS can ask for a fee enhancement—at least as a matter of law. It asks here for $99,947.50. That amount would increase KS' award by a percentage of 16%. KS' principle contribution to this case, for purposes of upward adjustment analysis, was its work on various aspects of litigation with SPC. KS assumed sole responsibility for litigating the estate's $82 million preference action against SPC, in which it successfully obtained a judgment for slightly in excess of $10.8 million. That judgment was appealed, with KS handling the appeal. KS made a strong contribution to the value of that appeal, as it served as an essential piece of the MTBE settlement with Chevron, ultimately relieving the estate of any liability for that late-in-the-game environmental crisis. The Fifth Circuit ultimately reversed the judgment, but by that time, it had served its purpose.[66]

KS also prosecuted, to ultimate settlement, the estate's lender liability lawsuit against SPC in state court. The denouement of that action proved significant for unsecured creditors of the estate—SPC dropped a $32 million secured claim, agreed to the subordination of whatever claim it might have if the preference judgment stood, and paid the estate $6 million in cash. Perhaps no other single aspect of the case yielded so important a result for the estate. As noted earlier, though, the fees earned by KS for this aspect of the case cannot further be revisited.

The court is hard pressed to conclude that KS' work in the preference action earns the same "rare and exceptional" label as did the work of VL. The work was certainly well done—and it clearly achieved an excellent result for the estate. Yet it cannot be said that the result obtained exceeded reasonable expectations for such litigation, nor can it be said that KS faced any peculiar obstacles in the pursuit of that litigation—certainly no more so than often arise in the vicissitude of contested litigation. Like the court in *First American Health Care,* this court can do little more than affirm the correctness of its original award and congratulate counsel on a job well done—but not further adjust KS' fees. *See In re First American Health Care of Georgia, Inc.,* 212 B.R. at 417. For this reason, the fee enhancement sought will be denied.

## IV. CONCLUSION

Under Section 330(a)(1), this Court concludes that KGM is entitled to a Section 330(a)(1) lodestar award in the total amount of $477,977.00 for services rendered to the Trustee through February 2000. VL is entitled to a Section 330(a)(1) lodestar award in the amount of $278,463.50, and an enhancement of

---

**66.** One lawyer at the hearing pointed out that, given the use to which the preference suit was put (*i.e.,* it was assigned to Chevron, in exchange for the aforementioned releases), the estate actually fared better with a reversal of the preference judgment. Had the judgment stood, the estate would not have added any additional dollars to the estate's coffers (because the action had been assigned to Chevron), but it would have had to have honored SPC's resulting unsecured claim for the amount of the judgment as affirmed, substantially diluting other recoveries in the estate.

$200,000. The fee enhancement request of Kemp Smith, in the amount of $99,947.50, is denied for the reasons stated. Orders consistent with this decision shall be entered on even date.